C07-6294 WHA

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

--o0o--

**FILED**

FEB - 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

THE PEOPLE OF THE STATE OF
CALIFORNIA,

              Plaintiff,

      vs.

JAIME FRANCO GUZMAN,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. SF347601A

SC063184

**ENDORSED FILED**
SAN MATEO COUNTY

FEB 2 6 2007

Clerk of the Superior Court
By    Mark Straiten
DEPUTY CLERK

COPY

-------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CARL W. HOLM, JUDGE
DEPARTMENT 23

<u>PRELIMINARY EXAMINATION</u>

FEBRUARY 7, 2007

A P P E A R A N C E S:

FOR THE PLAINTIFF:    JAMES P. FOX, DISTRICT ATTORNEY
                        BY:  AARON FITZGERALD, DEPUTY D.A.
                        Hall of Justice and Records
                        400 County Center
                        Redwood City, CA 94063-1655

FOR THE DEFENDANT:    MICHAEL HROZIENCIK, ESQUIRE
                        303 Bradford Street, Suite C
                        Redwood City, CA 94063

REPORTER:              STACY A. GASKILL
                        Official Court Reporter
                        CSR No. 10969

RECEIVED

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

| | | | | |
|---|---|---|---|---|
| 1 | | WITNESS INDEX | | |
| 2 | For the Plaintiff: | Direct | Cross | Redir. | Recross |
| 3 | TORRES, MANUEL | 6 | 12 | 14 | |
| 4 | | | | | |
| 5 | ALCARAZ, JERRY | 17 | 52 | 56 | |
| 6 | | | | | |
| 7 | TORRES, MANUEL | 58 | 65 | 68 | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |

```
 1                     P R O C E E D I N G S
 2                         February 7, 2007
 3
 4              THE COURT:  Line 2, Jaime Guzman.
 5              MR. FITZGERALD:  Aaron Fitzgerald for the
 6    People.
 7              MR. HROZIENCIK:  Good morning, Your Honor.
 8    Mike Hroziencik for Mr. Guzman.
 9              MR. FITZGERALD:  The People are ready.  Two
10    witnesses.  It will be Prop. 115.  Probably 45 minutes.
11              THE COURT:  Last time I handled this case I
12    think the estimate was two hours.  But maybe that was
13    before Mr. Hroziencik hurt himself.  How are you doing?
14              MR. HROZIENCIK:  I'll live.
15              THE COURT:  Are you right-handed or
16    left-handed?
17              MR. HROZIENCIK:  I am right-handed, but if it's
18    45 minutes or even two hours, I think I can make it.
19              THE COURT:  You are ready to proceed?
20              MR. HROZIENCIK:  Yes.
21              THE COURT:  Do you plan on calling any
22    witnesses?
23              MR. HROZIENCIK:  No.
24              THE COURT:  We'll pass it temporarily.  Thank
25    you.
26              (Other matters called.)
```

```
 1              THE COURT:   Let's bring in -- let's start with
 2   line 2, Jaime Guzman.
 3              Ms. Keith, why don't you come back at 3:30,
 4   please, with your client.
 5              Could we bring him over here, Mr. Guzman, and
 6   Mr. Hroziencik.
 7              MR. FITZGERALD:   Your Honor, if I may retrieve
 8   my officers.  I will be right back.
 9              THE COURT:   Sure.  Hopefully they are just
10   outside.
11              MR. FITZGERALD:   I sure hope so.
12              THE COURT:   Mr. Hroziencik, may we interrupt
13   the one-session rule on your case?
14              MR. HROZIENCIK:   Yes.
15
16              (Other matters called.)
17
18              THE COURT:   Mr. Fitzgerald, do you have your
19   People?
20              MR. FITZGERALD:   I do, thankfully.
21              THE COURT:   Are you designating an
22   investigating officer?
23              MR. FITZGERALD:   I am.  Detective Manuel
24   Torres, T-o-r-r-e-s.  He will be our first witness.
25              THE COURT:   Come on up here, please.
26              Raise your right hand and be sworn, please.
```

4

1              MANUEL TORRES,
2  called as a witness by the Plaintiff, was sworn and
3  testified as follows:
4              THE CLERK:  Do you solemnly state that the
5  evidence you shall give in this matter shall be the
6  truth, the whole truth and nothing but the truth, so help
7  you God?
8              THE WITNESS:  Yes.
9              THE CLERK:  Have a seat, please.
10             Could you state and spell your name for the
11  record.
12             THE WITNESS:  Manuel Torres.  M-a-n-u-e-l,
13  T-o-r-r-e-s.
14             THE COURT:  Sir, you are going to be asked some
15  questions, and we need you to wait until it's finished
16  before you try to answer it so we don't have two people
17  talking at the same time.
18             If you don't understand what you are being
19  asked, don't be embarrassed to ask for clarification.
20  It's not your fault.
21             We need you to try to only answer the question
22  asked of you.  Don't volunteer nor guess unless asked.
23  Okay?
24             THE WITNESS:  Yes, sir.
25             THE COURT:  Go ahead, Mr. Fitzgerald.
26             MR. FITZGERALD:  Thanks, Your Honor.

```
1                    DIRECT EXAMINATION

2          BY MR. FITZGERALD:  Q.  Good afternoon, sir.

3     A.   Good afternoon.

4     Q.   What is your occupation?

5     A.   Detective.

6     Q.   For what police department?

7     A.   The City of East Palo Alto.

8     Q.   For how long have you been employed with East

9  Palo Alto PD?

10    A.   For approximately four years.

11         THE COURT:  How many?

12         THE WITNESS:  Four years.

13         MR. FITZGERALD:  Q.  Have you completed a

14  training course certified by the commission on peace

15  officer standards and training which includes the

16  investigating of cases and writing of police reports and

17  testifying at preliminary hearings?

18    A.   Yes, sir.

19    Q.   Were you on duty on the date of November 1st

20  2006 at East Palo Alto PD?

21    A.   Yes.

22    Q.   As part of your duties as a detective, were you

23  made aware of a sexual assault case that took place in

24  the City of East Palo Alto in October of '06?

25    A.   Yes, sir.

26    Q.   As part of your duties, did you contact a
```

6

1    witness by the name of Martin Ortiz, O-r-t-i-z, on

2    November 1st of last year?

3         A.   Yes, sir.

4         Q.   Were you able to determine Mr. Ortiz's

5    relationship to a suspected Jane Doe victim in that case?

6         A.   Yes.

7              MR. FITZGERALD:   For the record, Your Honor,

8    this detective will be referencing Jane Doe No. 1 with

9    regards to his testimony.

10             THE COURT:   Hold on.

11             Mr. Hroziencik, the calendar indicates that

12   there was a Spanish interpreter for your client.  Does he

13   need one?

14             MR. HROZIENCIK:   I have been able to

15   communicate with Mr. Guzman in English perfectly well,

16   and he indicated to the Spanish interpreter that he does

17   not need a Spanish interpreter.

18             Mr. Guzman, is that right?

19             THE DEFENDANT:   That is correct.

20             MR. HROZIENCIK:   He is indicating to me right

21   now that he does not need an interpreter.

22             THE COURT:   So you understood what Detective

23   Torres has been talking about, sir?

24             THE DEFENDANT:   Yes, I do.

25             THE COURT:   Okay.  Thank you.

26             Go ahead.

                                                          7

1             MR. FITZGERALD:  Q.  Did you understand the

2  question?

3        A.  Yes.

4        Q.  Was the answer yes?

5        A.  Yes.

6        Q.  Did you determine Mr. Ortiz's relationship to

7  child Jane Doe, age 4?

8        A.  I'm sorry?

9        Q.  Sure.

10            Did Mr. Ortiz tell you his relationship to

11  child Jane Doe, age 4?

12       A.  Yes.  Mr. Ortiz related to me that Jane Doe

13  No. 1, he identified her as his niece.

14       Q.  I'm going to refer you to the date of October

15  9th of last year at around 9:30 a.m.  Did he advise you

16  if he had observed anything unusual taking place on that

17  date around that time?

18       A.  Mr. Ortiz told me he came home to 8 Newell

19  Court, Apartment No. T9.

20       Q.  In what city?

21       A.  East Palo Alto California.

22       Q.  Did he tell you that on that date, within San

23  Mateo County, if he observed anything unusual?

24       A.  Yes.

25       Q.  Please describe what he told you he observed?

26            THE COURT:  Hold on a minute.

8

1           Can we take these three inmates out and put

2    them in the holding cell, please?

3           MR. HROZIENCIK:  Thank you, Your Honor.

4           (Pause in proceedings.)

5           THE COURT:  In any event, you were asking him

6    about October 9th around 9:30 observing something at

7    Apartment T9?

8           THE WITNESS:  Yes.

9           THE COURT:  'T' as in "turkey"?

10          THE WITNESS:  'T' as in "turkey," sir.

11          MR. FITZGERALD:  Q.  Detective, what did

12   Mr. Ortiz tell you he observed on that date and time?

13       A.    Mr. Ortiz stated that he walked through the

14   front door of the apartment.  When he walked through the

15   front door of the apartment, he saw Jane Doe No. 1 lying

16   on the couch in the living room.  He identified that

17   Mr. Franco was kneeling next to the victim who was on the

18   couch.  Mr. Ortiz --

19       Q.    Let me stop you there, Detective.

20          You mentioned a person by the name of

21   Mr. Franco.  Did he identify this person by his first

22   name?

23       A.    Yes.

24       Q.    What was his first name?

25       A.    He identified him as Jaime.

26       Q.    What did Mr. Ortiz tell you he observed next?

9

1    A.    As he walked in through the apartment when he
2    saw them next to the couch in the living room, he
3    observed that Mr. Franco had his pants down to his knees.
4    And when he walked towards their location, he noticed
5    that Mr. Franco covered Jane Doe No. 1 with a blanket and
6    further observed that he raised one of his fingers to her
7    lips as to insinuate for her to keep quiet.

8    Q.    Did Mr. Ortiz describe the physical positioning
9    of this Jaime Franco in relation to his niece, how they
10   were positioned?

11   A.    He described that Jane Doe No. 1 was lying on
12   her back on the couch, and Mr. Franco was kneeling just
13   in front of her on the -- beside the couch.

14   Q.    With regards to the -- what happened next, what
15   did Mr. Ortiz say he saw happening next?

16   A.    When he observed Mr. Franco cover her with a
17   blanket and saw him place a finger up to her mouth, he
18   walked to their location.  He uncovered Jane Doe No. 1
19   and observed that her pants were down just above her
20   knees, as well.

21   Q.    Did Mr. Ortiz tell you what he saw, if
22   anything, Jaime do with his pants?

23   A.    Mr. Ortiz related to me that Mr. Franco was
24   pulling his pants up.

25   Q.    Did Mr. Ortiz describe the manner in which this
26   person named Jaime walked away from this child when he

10

1  approached?

2      A.   I do not recall.

3      Q.   So what did Mr. Ortiz tell you he did when he

4  walked over to the child Jane Doe, aged 4?

5      A.   After uncovering the victim and noticing that

6  her pants were pulled down just above her knees, as well,

7  Mr. Ortiz began to strike Mr. Franco with his fists.

8      Q.   Did Mr. Ortiz tell you if this Jaime said

9  anything while he was beating him?

10     A.   He made --

11     Q.   When you say "he," make sure you explain who

12  the "he" is.

13     A.   Mr. Ortiz told me that Mr. Franco made a

14  statement something to the effect he was just trying to

15  bring their family closer together.

16     Q.   What happened next, according to Mr. Ortiz?

17     A.   According to Mr. Ortiz, Mr. Ortiz just assumed

18  that that was a rare statement and at that point is when

19  he continued striking Mr. Franco with his fists.

20     Q.   After he struck this Mr. Franco -- this Jaime

21  Franco with his fists, what happened next according to

22  Mr. Ortiz?

23     A.   Jane Doe No. 1 started to cry.  He picked her

24  up and carried her upstairs to her mother.

25     Q.   Did Mr. Ortiz tell you where he saw this Jaime

26  Franco go?

11

1      A.    Mr. Ortiz told me he saw Mr. Franco run into

2  the apartment's kitchen.

3      Q.    And did Mr. Ortiz tell you if he observed Jaime

4  Franco doing anything unusual while in the kitchen?

5      A.    Mr. Ortiz told me that Mr. Franco attempted to

6  stab himself and attempted to cut his wrists.

7      Q.    Did Mr. Ortiz tell you what he did after he

8  took child Jane Doe No. 1 upstairs?

9      A.    Mr. Ortiz related to me he came back downstairs

10  as to prevent Mr. Franco from leaving the residence until

11  police arrival.

12           MR. FITZGERALD:  With that, no further

13  questions at this time, Your Honor.

14           THE COURT:  Cross-examination.

15           MR. HROZIENCIK:  Thank you.

16                  CROSS-EXAMINATION

17           BY MR. HROZIENCIK:  Q.  Did Mr. Ortiz tell you

18  how many times he saw Mr. Franco stab himself?

19      A.    I do not recall, no.

20      Q.    Did Mr. Ortiz tell you whether Mr. Franco

21  actually made any attempts to flee the house?

22      A.    He did not.

23      Q.    Were you present on October 9th when police

24  presumably came to the scene?

25      A.    No, sir.

26      Q.    Do you know if Mr. Franco was hospitalized

                                                      12

1   because of the self-inflicted stab wounds?

2        A.   Yes, sir.

3        Q.   When Mr. Ortiz observed that the Jane Doe

4   victim's pants were down, was he able to tell whether her

5   underwear was also down as well?

6        A.   He did not recall if her underwear was down or

7   not.

8        Q.   When he observed Mr. Franco's pants being down,

9   was he able to see if his underwear was down?

10       A.   He also did not recall if his underwear was

11  down.

12       Q.   When he went upstairs with the Jane Doe victim,

13  was -- who else was upstairs?

14       A.   I believe just Jane Doe's mother, and I don't

15  recall, but I believe there might have been another child

16  in the house.

17       Q.   So the Jane Doe's victim's mother was upstairs

18  at the time this happened?

19            MR. FITZGERALD:  Objection.  Calling for

20  discovery.

21            THE COURT:  Well, given the answer, it strikes

22  me as being -- wait a minute.  You are talking about the

23  mother, not a possible other child?

24            MR. HROZIENCIK:  The mother.

25            THE COURT:  Overruled.

26            Your answer?

                                                    13

1           THE WITNESS:  Can you ask the question one more
2    time?
3           MR. HROZIENCIK:  Q.  Did Mr. Ortiz tell you
4    that Jane Doe's mother was home at the time that this
5    happened?
6       A.   Yes.
7       Q.   Did Mr. Ortiz tell you whether the mother
8    observed any of the activities between Mr. Guzman and
9    Jane Doe?
10      A.   He did not.
11      Q.   Was Mr. Ortiz able to tell you what the
12   relationship was between Mr. Guzman and either Jane Doe
13   or Jane Doe's mother?
14      A.   I'm sorry.  Can you ask that one more time?
15      Q.   Was Mr. Ortiz able to tell you what
16   Mr. Franco's relationship was with Jane Doe or her
17   mother?
18      A.   Yes.  Mr. Ortiz related to me that Mr. Franco
19   was just a friend of Jane Doe's mother.
20      Q.   So it wasn't some stranger that just walked in
21   off the street?
22      A.   Correct.
23           MR. HROZIENCIK:  I have no further questions.
24           THE COURT:  Redirect?
25           MR. FITZGERALD:  Just a couple, Your Honor.
26                    REDIRECT EXAMINATION

                                                        14

1          BY MR. FITZGERALD:   Q.   This person by the name

2     of Jaime Franco, did you ultimately place a person by the

3     name of Jaime Franco under arrest in connection with this

4     case?

5          A.    Yes.

6          Q.    Did you transport him to the San Mateo County

7     Jail?

8          A.    Correct.

9          Q.    Conduct a booking of this Jaime Franco?

10         A.    Yes.

11         Q.    Do you see the person who identified himself as

12    Jaime Franco present in court today?

13         A.    Yes.

14         Q.    Can you please identify him for the record

15    pointing to where he's seated and describe what he's

16    wearing.

17         A.    In the red shirt next to the defense attorney.

18              MR. FITZGERALD:   Reflecting identification of

19    the defendant, Your Honor.

20              THE COURT:   Yes.

21              MR. FITZGERALD:   Q.   Lastly, Detective, did

22    Mr. Ortiz describe to you what the defendant was wearing

23    on the day that he observed him kneel next to the minor

24    victim?

25         A.    Mr. Ortiz recalled Mr. Franco was dressed in

26    khaki pants and a white T-shirt.

1              MR. FITZGERALD:  I have no further questions.
2   Thank you, sir.

3              THE COURT:  Anything else, Mr. Hroziencik?

4              MR. HROZIENCIK:  No, Your Honor.  But it dawns
5   on me that I do need to ask this witness some questions
6   that are outside the scope of the direct exam.

7              THE COURT:  Let's see if it's germane.  Because
8   he is the investigating officer anyway.

9              Why don't you step down, Detective, and we'll
10  see who the next witness is?

11             MR. HROZIENCIK:  Okay.

12             It would be germane to a defense.

13             THE COURT:  I appreciate that.  That assumes
14  some crimes are shown here.

15             MR. HROZIENCIK:  Sure.

16             THE COURT:  Next witness, Mr. Fitzgerald.

17             MR. FITZGERALD:  At this time the People call
18  Detective Alcaraz to the stand.

19             THE COURT:  Come on up here quickly, please.

20             When you get up here, raise your right hand and
21  be sworn, if you would.

22                        JERRY ALCARAZ,

23  called as a witness by the Plaintiff, was sworn and
24  testified as follows:

25             THE CLERK:  Do you solemnly state that the
26  evidence you shall give in this matter shall be the

                                                          16

1  truth, the whole truth and nothing but the truth, so help

2  you God?

3         THE WITNESS:  I do.

4         THE CLERK:  Have a seat, please.

5         Sir, could you state and spell your name for

6  the record.

7         THE WITNESS:  Jerry Alcaraz.  J-e-r-r-y,

8  A-l-c-a-r-e-z.

9         THE COURT:  Good afternoon again.  You have

10  been in here before, and I don't know if you remember me

11  advising you of this, but I'll do it again.

12         Please wait until the question is finished

13  before you try to answer it so we don't have two people

14  talking at the same time.  Sometimes we anticipate what's

15  being asked and we start talking over each other.

16         If you don't understand what you are being

17  asked, don't be embarrassed to ask for clarification.

18  It's not your fault.

19         Try to only answer the question asked of you.

20  Don't volunteer nor guess.  Okay?

21         THE WITNESS:  Yes.

22         THE COURT:  Go ahead, Mr. Fitzgerald.

23         MR. FITZGERALD:  Thanks, Your Honor.

24                    DIRECT EXAMINATION

25         BY MR. FITZGERALD:  Q.  Good afternoon, sir.

26         A.    Good afternoon.

1    Q.   Your occupation?

2    A.   Police officer with the City of East Palo Alto.

3    Q.   For how long have you been with East Palo Alto?

4    A.   Eight years.

5    Q.   That's as an officer?

6    A.   Yes.

7    Q.   Were you on duty on October 9th, 2006 at around

8    12:30 p.m.?

9    A.   Yes.

10   Q.   On that date and around that time, did you

11   receive information regarding a stabbing slash sexual

12   assault case that took place at 8 Newell, N-e-w-e-l-l,

13   Court, Apartment T9, East Palo Alto, San Mateo County?

14   A.   Yes.

15   Q.   And did you respond to that location?

16   A.   I did not.

17   Q.   Did you receive information from another

18   officer regarding an incident that took place at that

19   location?

20   A.   Yes.

21   Q.   What information did you receive?  First, I'm

22   sorry.  Let me rephrase it.

23        Which officer provided you that information?

24   A.   Sergeant Rhodes.

25   Q.   What did Sergeant Rhodes inform you of?

26   A.   Sergeant Rhodes was at the scene of the

18

1  incident, and he gave me a quick synopsis of what he had

2  learned, which was that a four or five year old victim

3  was found laying on the couch with her pants pulled down

4  and that a suspect was kneeling next to the victim, and

5  then a witness who was later determined to be a family

6  member walked into the apartment and saw that scene.

7      Q.    Were you made aware that there was a suspect

8  that had been transported to a hospital for treatment

9  following this incident?

10     A.    Yes.

11     Q.    Did you initially respond to the house that

12  first day?

13     A.    No.

14     Q.    The following day, on October 10th, did you

15  respond to Stanford Hospital to interview a suspect

16  ultimately determined to be Jaime Guzman?

17     A.    Yes.

18     Q.    Is Mr. Guzman present here in court today?

19     A.    He is.

20     Q.    Can you please identify him for the record,

21  pointing to where he is seated and describe what he is

22  wearing?

23     A.    Yes.  He is seated to your left with the red

24  top and orange undershirt.

25         MR. FITZGERALD:  Reflecting identification of

26  the defendant, Your Honor.

1            THE COURT:  Yes.

2            MR. FITZGERALD:  Q.  Where did you contact the

3    defendant?

4        A.   At Stanford Hospital.

5        Q.   When you contacted him, what room did you

6    contact him in?

7        A.   I believe it was E204.

8        Q.   Is this a hospital room?

9        A.   Oh, yes, it is.

10       Q.   Is there any particular floor that he was on,

11   if you recall?

12       A.   That was on the second floor.

13       Q.   Was it a special type of room?  Emergency room?

14   You know, intensive care, if you remember?

15       A.   It was a recovery room.

16       Q.   When you contacted the defendant the following

17   day, were you alone or with anybody else?

18       A.   I was with Detective Torres.

19       Q.   And were you in uniform that day?

20       A.   No.

21       Q.   Was Detective Torres in uniform that day?

22       A.   No.

23       Q.   Were you armed with a visible weapon at that

24   point?

25       A.   No.

26       Q.   Do you remember what you were wearing?

                                              20

1      A.    Attire similar to what I'm wearing now.

2      Q.    For the record, would it be a suit and tie?

3      A.    Yes.

4      Q.    Do you recall what Detective Torres was wearing

5 that day?

6      A.    Similar attire.

7      Q.    When you contacted the defendant, were there

8 any other officers present?

9      A.    Just --

10      Q.    Besides you and Detective Torres?

11      A.    No.

12      Q.    When you contacted the defendant, please

13 describe what you observed.

14      A.    I initially observed the defendant laying in

15 his hospital bed.

16      Q.    Had there been any guard or any officer that

17 had been placed at the hospital prior to arrival there to

18 interview him?

19      A.    No.

20      Q.    Had he been placed under arrest?  Do you have

21 any personal knowledge of that?  Prior to your contact of

22 the defendant at the hospital.

23      A.    He had not been.

24      Q.    When you first contacted the defendant, did you

25 handcuff the defendant?

26      A.    No.

1      Q.    Did you advise him at that point that he was
2    being arrested?

3      A.    No.

4      Q.    What was your purpose in arriving there,
5    Detective?

6      A.    To obtain a statement.

7      Q.    When you contacted the defendant, describe what
8    you saw physically?  How did the defendant appear to you?

9      A.    He was, again, laying -- he was awake laying in
10   a hospital bed.  He appeared to have some kind of -- I
11   don't know if it was an IV tube either stuck to the back
12   of his hand or to the middle part of his arm.  He was
13   dressed in a hospital gown, and that was about it.

14     Q.    Were you able to communicate with the defendant
15   when you arrived?

16     A.    Yes.

17     Q.    What language was it in?

18     A.    English.

19     Q.    When you contacted him, were you able to
20   communicate with him without any sort of problems in
21   understanding each other?

22     A.    Yes.

23     Q.    When you arrived, what did you first do when
24   you contacted the defendant?

25     A.    I told him who I was and who Detective Torres
26   was and where we worked.

22

1      Q.    Describe your demeanor when speaking with the
2   defendant?

3      A.    Similar to now.

4      Q.    Very calm?

5      A.    Yes.

6      Q.    Who did most of the talking when you were there
7   with the defendant?  Was it yourself or Detective Torres?

8      A.    Me.

9      Q.    So when you contacted him, did you provide any
10  sort of admonishment to the defendant prior to speaking
11  with him substantively about the case?

12     A.    Yes.

13     Q.    What did you tell the defendant?

14     A.    I told him that he was not under arrest and
15  that he was free to leave.  However, because of his
16  medical condition, if that prevented him from leaving, he
17  was still not obligated to talk to myself or to Detective
18  Torres.

19     Q.    When you were saying these things, did you have
20  your weapon drawn?

21     A.    No.

22     Q.    Were you yelling at the defendant?

23     A.    No.

24     Q.    Did you see Detective Torres doing either of
25  those two things?

26     A.    No.

23

1       Q.   Did the defendant then freely speak with you
2   after you advised him of this?

3       A.   Yes.

4       Q.   Did you ask the defendant why he was at the
5   hospital?

6       A.   Yes, I did.

7       Q.   What was the defendant's response to you?

8       A.   He initially told me that all he remembered was
9   being by a swimming pool and then waking up in the
10  hospital.

11      Q.   Did you determine his date of birth?

12      A.   Yes, I did.

13      Q.   What was that?

14      A.   February 14th, 1980.

15      Q.   Did you ask him if he had any reason to know
16  why you were present or speaking with him?

17      A.   Yes.

18      Q.   What was his response?

19      A.   He told me that it might have been for some
20  unpaid tickets.

21      Q.   Did he describe the type of tickets?

22      A.   No.   I don't recall if he did.

23      Q.   What did you do next in speaking with the
24  defendant?

25      A.   I asked him if -- actually, can you be a little
26  more specific?

24

1    Q.    Did you explain to him the real reason why you

2    were there at the hospital to see him?

3    A.    Yes, I did.

4    Q.    What did you tell him why you were there?

5    A.    I told him that I wanted to speak to him about

6    what had occurred over on 8 Newell Court.

7    Q.    Did the defendant then freely discuss with you

8    that incident?

9    A.    Yes, he did.

10   Q.    Did he provide you an initial statement about

11   what happened over on Newell Street in regards to that

12   incident?  Did he explain what took place?

13   A.    Yes.

14   Q.    What did he first tell you?

15   A.    He initially told me that he was there working

16   on a computer, and the computer was located near the

17   bathroom, and, for whatever reason, a subject by the name

18   of Martin came into the apartment and became very

19   aggressive with him for some unknown reason and started

20   to hit him.

21   Q.    Did he explain to you his relationship to that

22   particular apartment, what his connection was?

23   A.    Yes.  He said his friend Veronica Ortiz lived

24   there.

25   Q.    Did he discuss knowing that there was a

26   juvenile girl or a minor girl that also lived there at

25

1   the apartment?

2        A.    Yes.

3        Q.    What did he first say about that, if you can
4   remember?

5        A.    He initially told me that while he was working
6   on the computer, the juvenile, who was Veronica's
7   daughter, had come out of the bathroom and requested some
8   assistance with pulling her pants up.

9        Q.    Did you then present the defendant with some
10  additional facts or questions after he gave you that
11  first response?

12       A.    Yes.

13       Q.    What did you say in response to the defendant's
14  first statement to you?

15       A.    I asked him how he and the victim ended up on
16  the couch.

17       Q.    And what was the defendant's response?

18       A.    He said that when the victim had come out of
19  the bathroom, she had urinated on herself.  He was
20  having -- because she urinated on herself, he was having
21  problems pulling her underwear and her pants up.  He said
22  that he yelled to Veronica to come down and assist.
23  However, she didn't come down, so he took the victim over
24  to the couch and laid her face down on the couch in an
25  attempt to pull her pants and her underwear up.

26       Q.    Did you ask the defendant how he was able to

26

1    get the victim over to the couch?

2         A.    No.    I don't recall if I did.

3         Q.    Would it refresh your recollection to take a

4    quick look at your police report?

5         A.    Yes.

6         Q.    If you can take a look at page 10 of your

7    report.   Looks like it's the third real paragraph which

8    begins with, "I asked Guzman to tell me how he and the

9    victim."

10            Once your recollection is refreshed, you can

11   look up.

12            Is your recollection now refreshed?

13        A.    Yes.

14        Q.    How did the defendant describe how he brought

15   this minor girl over to the couch?

16        A.    I wasn't very descriptive in my report other

17   than Guzman and the victim went over to the couch.

18        Q.    Did he describe what he asked the victim to do

19   when he asked her to go over to the couch?

20        A.    Yes.   He asked her to lay on the couch face

21   forward.

22        Q.    What did he describe that he tried to do?

23        A.    He again tried to pull the victim's underwear

24   and pants up.

25        Q.    Did the defendant explain to you why he was

26   observed kneeling next to this minor girl?

27

1        A.    Yes.

2        Q.    What did he say about that?

3        A.    Because he was trying to assist her with

4   pulling her pants and her underwear up.

5        Q.    Did you ask the defendant about three initials,

6   specifically, DNA?

7        A.    Yes, I did.

8        Q.    And at this point did you ask him any questions

9   about any of his DNA being anywhere near this minor girl?

10       A.    Yes.

11       Q.    If you can please describe the context of this

12  discussion of DNA?

13       A.    I asked the defendant if he was familiar with

14  DNA.  He said that he was, and I asked him if there would

15  be any reason why his DNA would have been anywhere near

16  -- on the victim.

17       Q.    What was the defendant's response?

18       A.    He told me that it would have been on her

19  privates.

20       Q.    Did you ask him to clarify the reference to

21  privates?

22       A.    Yes, I did.

23       Q.    What did the defendant say when you asked him

24  to clarify?

25       A.    He said that it would be on her vagina.

26       Q.    Did you then conduct a ruse on the defendant in

28

1  order to try and elicit the truth?

2      A.  Yes, I did.

3      Q.  Do you, as part of your training and

4  experience, learn how to sometimes say information that

5  you don't entirely know to get people to say things to

6  you?

7      A.  Yes.

8      Q.  Did you then at that point give the defendant a

9  ruse about some additional information you had?

10     A.  Yes.

11     Q.  What did you say?

12     A.  I told him that since his blood was at the

13 initial crime scene, I told him we were able to extract

14 his DNA from that blood and make a match to DNA found on

15 the victim.

16     Q.  Did you discuss where you would be able to find

17 the DNA in relation to any of the victim's body parts?

18     A.  Yes.

19     Q.  What part of the body of the victim did you say

20 they would be able to recover DNA from?

21     A.  I specifically indicated the victim's vagina.

22     Q.  When you said that it was possible to find DNA

23 inside of the victim's vagina, did he then have an

24 explanation for why it might be there?

25     A.  Yes.

26     Q.  What did he say?

29

1      A.    He told me that while the victim was laying on

2   the couch, because she had urinated on herself, he had

3   gotten a baby wipe and was attempting to clean her.

4   While he was doing that, the baby wipe ripped, and he

5   accidentally inserted I believe it was his right index

6   finger into her vagina.

7      Q.    Did the defendant tell you if the victim said

8   anything in response to the defendant sticking his finger

9   in her vagina accidentally?

10     A.    Yes.

11     Q.    What did he say that the victim told him at

12  that point?

13     A.    To keep it in there.

14     Q.    What did the defendant say he said at that

15  point?

16     A.    He told the victim no.

17     Q.    Did you discuss with him how his belt happened

18  to have come loose during this baby wiping?

19     A.    Yes.

20     Q.    What was the defendant's response about that?

21     A.    He said the victim reached over and unbuckled

22  his belt.

23     Q.    Did the defendant try and explain how the

24  victim's pants got around her knees?  Did he explain how

25  the victim's pants were pulled down?

26     A.    Yes.

30

1     Q.   How did he explain that?

2     A.   He earlier explained that the victim had come

3 out of the bathroom like that.

4     Q.   Did the defendant explain how his pants got

5 down and who caused his pants to be pulled down?

6     A.   Yes.

7     Q.   What did the defendant say about that?

8     A.   He said that when the victim undid his belt,

9 that his pants came down.

10    Q.   Did you ask the defendant how many times he had

11 inserted his finger into the victim's vagina on this

12 particular day?

13    A.   Yes.

14    Q.   How many times did he say he inserted his

15 finger into her vagina?

16    A.   I believe it was just one time.

17    Q.   Would it help to refresh your recollection if

18 you were to take a look at your report as to the exact

19 number?

20    A.   Yes.

21    Q.   Take a look at page 11 of your report, please.

22 It's the third real paragraph that begins with "I asked

23 Guzman how many times he inserted."

24    A.   Okay.

25    Q.   Is your recollection now refreshed as to how

26 many times the defendant said he stuck his finger in her

31

1  vagina on that day?

2      A.   Yes.

3      Q.   How many times?

4      A.   Two times.

5      Q.   Did the defendant explain the circumstances

6  that led him to accidentally stick his finger in her

7  vagina a second time?

8      A.   Yes.  The first time being accidental.  When he

9  tried to remove it, the victim grabbed his hand and

10  pushed his hand back into her vagina -- or his finger.

11  I'm sorry.

12     Q.   What did the defendant say he did in response

13  to the second time he inserted his finger into her

14  vagina?

15     A.   At that point he pulled his hand away from the

16  victim and said no.

17     Q.   Did you then ask the defendant if his DNA would

18  be found in any other part of this minor girl's body?

19     A.   Yes.

20          MR. FITZGERALD:  Your Honor, at this time I

21  wish to advise the court that this next bit of testimony

22  will be dealing with Counts 3, 4, 5, 6, 7 and 8 of the

23  complaint, just for the court's review.

24          THE COURT:  Thank you.

25          MR. FITZGERALD:  Q.  Did the defendant mention

26  a date where there was some other sexual contact

                                                    32

1  involving him and this minor victim?

2      A.   Yes.

3      Q.   Do you remember the date that he actually

4  started discussing on an earlier incident?

5      A.   October 7th of 2006.

6      Q.   So in the context of this DNA discussion, did

7  the defendant describe an incident that took place on

8  October 7th at the same apartment?

9      A.   Yes.

10     Q.   What did the defendant say about any earlier

11 contact with any of the victim's private parts?

12     A.   He said on that date he was spending the night

13 at the victim's house as he normally did, and he was

14 trying to -- he was trying to sleep, and the victim came

15 to where the defendant was and laid next to him.  She

16 pulled her underwear down and started asking the

17 defendant to, I believe he described to touch her bootie.

18     Q.   Did the defendant say what he did in response

19 to that?

20     A.   He initially told her no.

21     Q.   And did the defendant then say what happened

22 next?

23     A.   Yes.

24     Q.   What was that?

25     A.   The victim grabbed the defendant's right hand

26 and forced him to insert his finger into her vagina and

33

1   into her anus.

2     Q.   Regarding her vagina first, did the defendant

3   describe how many separate occasions that the victim

4   forced him to stick his fingers in her vagina?

5     A.   Yes. At least three occasions.

6     Q.   With regards to the victim's anus, did the

7   defendant tell you how many times that the victim forced

8   him to stick his hand in her anus?

9     A.   Also three times.

10     MR. FITZGERALD: Your Honor, the testimony

11   elicited the People will also be asking the court to

12   review holding orders as to Counts number 18 through 22,

13   as well, which involve the penetration issue. Just for

14   the court's review.

15     THE COURT: Are you alerting me that the next

16   bit of evidence will relate to Counts 18 through 22?

17     MR. FITZGERALD: What the court just heard the

18   People will be asking also to hold on Counts 18 through

19   22, just for the court's benefit.

20     THE COURT: We'll see. Thank you.

21     Any other questions of this witness?

22     MR. FITZGERALD: Yes.

23     Q.   After this discussion of the incidents that

24   took place on October 7th, did the defendant describe to

25   you an earlier date where the defendant had touched this

26   victim?

34

1           A.    Yes.

2           Q.    What date did he reference?

3           A.    It wasn't a specific date other than

4    approximately a week before the October 7th incident.

5           Q.    On or about October 1st?

6           A.    Yes.

7           Q.    What did the defendant say about any incident

8    that took place on or about October 1st of 2006?

9           A.    He described a similar incident where he was

10   again spending the night at the victim's house and trying

11   to sleep when the victim came and laid next to him and

12   again pulled her underwear down.

13          Q.    Did the defendant describe what happened next

14   after the underwear was pulled down?

15          A.    Yes.  Similar to the incident I just described,

16   the victim again grabbed the defendant's hand and made

17   him insert his finger into her vagina and her anus.

18          Q.    Did he describe a number of separate times that

19   he stuck his finger in her vagina on that date?

20          A.    On at least three occasions.

21          Q.    Regarding the victim's anus, did the defendant

22   advise you how many times that he stuck his finger

23   separate times into her anus on that date or around that

24   date?

25                THE COURT:  Please sit down, ma'am, or step

26   outside.  Thank you.

35

1          THE WITNESS:  Also three.

2          MR. FITZGERALD:  Q.  I'm sorry?

3     A.   Also three times.

4     Q.   Did the defendant explain to you why he had

5     attempted to stab himself?

6     A.   Yes.

7     Q.   What was his explanation for why this stabbing

8     took place?

9     A.   He actually offered several explanations.  The

10    first being that I believe he had told me he was an

11    on-line gambler, and there had been some sort of law that

12    made that illegal which made him upset since that was a

13    major source of income for him.

14    Q.   Did he have any other explanation for why he

15    wanted to end it all?

16    A.   Yes.  He also told me that when he had been --

17    the victim's uncle had come in and observed them, him

18    kneeling on the couch and the victim on the couch, he

19    just wanted everything to end.

20    Q.   As part of your investigation, did you have an

21    opportunity to interview the child, Jane Doe, the victim

22    referenced in all the counts of the complaint?

23    A.   Yes.

24    Q.   In fact, did you interview her on October 20th

25    of last year?

26    A.   I did.

1          Q.   Do you remember where you interviewed her?

2          A.   I do.   At the Keller Center.

3          Q.   In the City of San Mateo?

4          A.   Yes.

5          Q.   When you spoke with her, did you speak with her

6     in Spanish or in English?

7          A.   In Spanish.

8          Q.   Are you certified at the department in Spanish?

9          A.   Yes.

10         Q.   For how long have you been certified with

11    San Mateo PD?

12              THE COURT:   You mean East Palo Alto?

13              MR. FITZGERALD:   I'm sorry.   I apologize, Your

14    Honor.

15         Q.   With regards to the East Palo Alto Police

16    Department, you are certified, sir?

17         A.   Yes, I am.

18         Q.   For how long?

19         A.   Several months after I was hired.

20         Q.   How long have you been a Spanish speaker?

21         A.   Since I could first talk.

22         Q.   Is that your native language?

23         A.   Yes.

24         Q.   Do you have any special education or training

25    in Spanish speaking?

26         A.   No.

1       Q.   Do others at the East Palo Alto Police

2   Department use you out in the field for translation or

3   interpretation?

4       A.   Yes.

5       Q.   When you spoke with Jane Doe No. 1, did you

6   have any difficulty in communicating with her in the

7   Spanish language?

8       A.   No.

9       Q.   If you can describe the context of the

10  interview.  Where did you interview her specifically?

11      A.   In the children's interview room at the Keller

12  Center.

13      Q.   When you spoke with her, did you ask her how

14  old she was?

15      A.   I did.

16      Q.   How old did she say she was?

17      A.   She actually held up four fingers to indicate

18  that she was four years old.

19      Q.   Did you ask her how many fingers she was

20  holding up?

21      A.   Yes.

22      Q.   What did she say?

23      A.   Four.

24      Q.   Did you have a conversation with her regarding

25  her duty to tell the truth?

26      A.   Yes.

1    Q.    If you can please describe the nature of

2  discussing this concept with her?

3    A.    I asked her if she knew the difference between

4  the truth and a lie.  She said that she did.  And so I

5  tested her, if you will.  I asked her -- or I told her if

6  I were to tell you that your name was Yuritza, would that

7  be the truth or a lie?  And the victim indicated that it

8  would be a lie because that is not her name.

9    Q.    Did you then discuss with her her ability to

10  know a truth versus a lie?

11    A.    No.

12    Q.    Was there a discussion of colors of crayons, if

13  you recall?

14    A.    Yes.

15    Q.    Did you ask her to be able to identify certain

16  colors of crayons?

17    A.    Yes.

18    Q.    Was she able to actually identify the actual

19  color of the crayons?

20    A.    No.

21    Q.    Did you then proceed to ask her additional

22  questions to make sure that you were able to communicate

23  with her truthfully?

24    A.    Yes.

25    Q.    Describe what you did next with the child, Jane

26  Doe.

1    A.    With regard to the crayons, what I did, I

2    had -- I asked her -- I gave her a color crayon, and

3    there was a coffee cup or a crayon cup on the table where

4    the interview was taking place.  I gave her the crayon

5    and asked her to perform several tasks such as place the

6    crayon inside the cup, place the crayon beside the cup,

7    and I had her place the crayon underneath the cup.

8         Q.    Regarding the first test, was she able to

9    follow your instructions?

10        A.    Yes.

11        Q.    Regarding the second test, was she able to

12   follow your instructions?

13        A.    Yes.

14        Q.    How about the third?

15        A.    Yes, she was.

16        Q.    After this, did you have any statements to her

17   about her duty to tell the truth?

18        A.    Yes.

19        Q.    What did you tell her about her duty to tell

20   the truth?

21        A.    I indicated to her that the room that we were

22   in, I told her I had a special name for it, and I called

23   it the truth room.  Because I like to talk about things

24   that were only true.  And I also told her that I only

25   liked talking about things that we knew to be true.

26             I gave her an example, and I asked her if she

                                                       40

 1    knew what my dog's name was.  And she said no, and then I
 2    further explained to her that it was okay to say "no" if
 3    she -- if I asked her a question that she did not know
 4    the answer to.
 5         Q.   To say "no," or "I don't know"?  Just so I
 6    understand you correctly.
 7              If she didn't know the answer to a question,
 8    what did you tell her to say?
 9         A.   I told her that it was okay to say that "I
10    don't know."
11         Q.   "I don't know"?
12         A.   Yes.
13         Q.   Did you ask the victim if she knew why she was
14    there speaking with you?
15         A.   I did.
16         Q.   What was Jane Doe's response?
17         A.   She told me that something bad had happened to
18    her.
19         Q.   Did she mention a name?
20         A.   Yes.  She said a boy named Jaime.
21         Q.   Did you ask what Jaime's relationship was to
22    her?
23              MR. HROZIENCIK:  Your Honor, before we go any
24    further, I might have an objection as to the competency
25    of the hearsay witness.  Part of my questioning as to
26    Detective Torres, as I indicated earlier, is I know from

                                                            41

1  the discovery that was provided to me is that Detective
2  Torres attempted to qualify the Jane Doe victim on an
3  earlier occasion and was unable to establish her
4  competency as a witness.
5           THE COURT:  We'll get to that, and you can move
6  to strike anything that the alleged victim said,
7  Mr. Hroziencik.
8           MR. HROZIENCIK:  All right.
9           THE COURT:  If appropriate.  Let's get this
10 detective done here.
11          So she said to you or you said to her about
12 something bad happened?
13          THE WITNESS:  That's correct.
14          THE COURT:  You said --
15          MR. FITZGERALD:  Q.  Which?
16     A.   She told me that something bad had happened to
17 her.
18          THE COURT:  By someone by the name of?
19          THE WITNESS:  Jaime.
20          MR. FITZGERALD:  Q.  Did you ask what Jaime's
21 relationship was to her?
22     A.   Yes, I did.  She told me that it was her mom's
23 friend, the one who fixes computers.
24     Q.   Did you have a chance ever to speak with mom?
25     A.   I don't believe so, no.
26     Q.   Did you then ask victim Jane Doe anything at

42

1   that point after she mentioned Jaime?

2          A.    Yes.

3          Q.    What did you ask her?

4          A.    I asked her what -- actually, I believe I

5   showed her a body parts diagram before asking her

6   anything.

7          Q.    Before showing her a diagram, did you ask her

8   if Jaime had hurt her?

9          A.    Yes, I did.

10         Q.    What was this victim's response?

11         A.    She told me that he had.

12         Q.    Did you then begin using some diagrams?

13         A.    Yes, I did.

14         Q.    Let's discuss, was there more than one, sir?

15         A.    Yes.

16         Q.    What was the first diagram you showed Jane Doe?

17         A.    The first diagram was of a female.

18         Q.    Did you ask the victim if she knew what was

19   being held?

20         A.    Yes.

21         Q.    What did she say that you were holding?

22         A.    She told me it was a picture of a girl.

23         Q.    Did you then point to various body parts on the

24   diagram?

25         A.    Yes, I did.

26         Q.    Did you ask the victim to identify the name

                                                              43

1   that she used for the various body parts?

2        A.   Yes.

3        Q.   Did you ask her if she was able to -- did you

4   ask her to identify the eyes?

5        A.   Yes.

6        Q.   Was she able to do so?

7        A.   She was.

8        Q.   Did you ask her to identify the nose?

9        A.   She was.

10       Q.   Was she able to do so?

11       A.   Yes.

12       Q.   Did you ask her to identify the breast of a

13  female?

14       A.   Yes.

15       Q.   And did she have a name for this -- for breast

16  for a female?

17       A.   Yes, she did.  She called them chichis.

18       Q.   Did you ask her to identify a hand or an arm?

19       A.   Yes.

20       Q.   How did she identify when you asked her to

21  describe a hand or an arm?

22       A.   She referred to I believe it was a hand -- I'm

23  sorry, the hand as an arm.

24       Q.   Or the arm as a hand?

25       A.   Or vice versa.

26       Q.   Let's make sure we have it right.  Take a look

44

```
 1   at page -- to further refresh your recollection, page
 2   No. 17, fifth paragraph, please.  Actually, maybe the
 3   fourth paragraph.  It begins with, "The victim was able
 4   to identify."
 5            What did she identify as what?
 6       A.   She identified the arm as a hand.
 7       Q.   Was she able to identify the butt?
 8       A.   Yes, she was.
 9       Q.   What did she call that?
10       A.   A bootie.
11       Q.   What about her private regions, the picture of
12   the vagina?  Was she able to name that?
13       A.   She was not.
14       Q.   After showing her this diagram, did you ask
15   her -- what did you do next?
16       A.   I asked her to show me where Jaime had hurt
17   her.
18       Q.   And what did the victim do in response?
19       A.   She pointed to the vagina of the body parts
20   diagram.
21       Q.   Was she holding anything when she was doing
22   this?
23       A.   A crayon.
24       Q.   And what did Jane Doe do after she identified
25   the vagina where she had been touched?
26       A.   She had started -- I believe it was coloring
```

45

1   the vagina area, or tracing it, I'm sorry.

2       Q.   What did you ask in response to that?

3       A.   I asked her if that was the area where Jaime

4   had hurt her.

5       Q.   What was her response?

6       A.   She said yes.

7       Q.   Did she describe the particular occasion when

8   this event took place, the touching of her vagina, what

9   incident this was?

10      A.   Yes.

11      Q.   How did she reference this incident or describe

12  it?

13      A.   She made reference by saying her uncle had come

14  in to the apartment.

15      Q.   At what point?

16      A.   After he had touched her.

17      Q.   Did the victim then have some facts and detail

18  on actually what took place that day?

19      A.   Yes.

20      Q.   Can you please describe what the victim told

21  you about what took place?

22      A.   I have to refer to my report.

23      Q.   Sure.   Take a look again at page 17.  It's the

24  third to last paragraph on that report.  It begins with,

25  "The victim told me she was downstairs in the living

26  room."

46

1           Once your recollection is refreshed, you can
2    look up and answer the question.

3           Is your recollection refreshed?

4       A.   Yes.

5       Q.   Did she tell you where this bad thing had
6    happened to her?

7       A.   Yes.  At her house.

8       Q.   Did she tell you physically where she was in
9    the house when this bad thing happened the day the uncle
10   came in?

11      A.   Yes.  She said she was laying on the couch.

12      Q.   Did she tell you what happened at that point?

13      A.   She said she was laying on the couch face down
14   and that the defendant was laying on top of her, and then
15   her uncle came in and saw what had happened.

16      Q.   Did she then describe physically what the
17   defendant did to her vagina?

18      A.   Yes.

19      Q.   What did she tell you that the defendant did?

20      A.   He had poked her.

21      Q.   Regarding poking, did he describe where he
22   poked her and where the finger went?

23      A.   Yes.  She indicated that he had poked her on
24   her vagina and that her -- his finger had gone inside of
25   her vagina.

26      Q.   Did you then show Jane Doe a diagram of a male?

47

1       A.    Yes.

2       Q.    Did you ask the Jane Doe what this diagram was

3   of?

4       A.    Yes.

5       Q.    What did she say?

6       A.    She called it a picture of a boy.

7       Q.    Did you then ask Jane Doe to identify any parts

8   of the body of this boy diagram?

9       A.    Yes.

10      Q.    Please explain.

11      A.    I asked her to identify -- I pointed to the

12   fingers and asked her what those were, and she correctly

13   identified them as fingers.

14      Q.    Did you ask her if it hurt her when the

15   defendant had touched her vagina?

16      A.    Yes.

17      Q.    What was her response?

18      A.    She told me that it did.

19      Q.    Did you ask her if Jaime had done any other

20   inappropriate touching on any other days?

21      A.    Yes.

22      Q.    Let's first deal with the touches to the

23   vagina.  Did she mention if the defendant on another day

24   had touched her vagina, just dealing with the vagina?

25      A.    No.

26      Q.    Are you sure or would it help to look at a

48

```
 1   report to see if that's a no or --
 2        A.    I have to look at my report again.
 3        Q.    Okay.  If it would help.  Take a look at page
 4   No. 18.  I want to make sure we are getting out what
 5   happened.
 6              It's the first true paragraph which begins, "I
 7   asked the victim if it hurt her."
 8              Take a look at the last sentence in that
 9   paragraph.
10              Is your recollection refreshed?
11        A.    Yes.
12        Q.    Do you recall if she mentioned that she had
13   been touched on her vagina by Jaime on a different day?
14        A.    Yes.
15        Q.    Having looked at this portion of the report,
16   does this refresh your recollection to what she told you?
17        A.    Yes.
18        Q.    What did she tell you when you asked her that?
19        A.    That it did happen on a different day.  Or it
20   had happened on a different day.
21        Q.    Did she tell you -- did she then describe where
22   this touching would take place?  What location?
23        A.    Yes.
24        Q.    Where did she describe that this touching would
25   take place?
26        A.    At her house.
```

49

1     Q.    Did she describe kind of how this touching

2    would take place, what would happen to her clothes in

3    relation to Jaime's clothes?

4     A.    Yes.

5     Q.    What did she tell you about that?

6     A.    She said that Jaime would pull her pants and

7    underwear down past her knees, and that he would also do

8    the same with his pants and underwear, and that he would

9    pull those down past his knees as well.

10     Q.    Did you then go back to the diagram and ask her

11    some questions about other possible touching?

12     A.    Yes.

13     Q.    Did you ask her if she had been touched

14    anywhere else besides her vagina in showing her the

15    diagram?

16     A.    Yes.

17     Q.    What was her initial response to you?

18     A.    She initially said no, that she had not been

19    touched anywhere.

20     Q.    Now what side of the diagram were you showing

21    her when you asked her if she had been touched anywhere

22    else?  Was it the front of the diagram or the back?

23     A.    The front part.

24     Q.    Just so we're clear, does the diagram have --

25    is it split in half with the front side on one side, the

26    back side on the other side with regards to a boy and a

1   girl?

2       A.   Yes.

3       Q.   Did you then turn the diagram over of the

4   female?

5       A.   Yes.

6       Q.   And did you ask her anything in relation to the

7   back side of the female showing the other side of the

8   diagram?

9       A.   Yes.  I pointed to the diagram and asked if she

10  had been touched anywhere.

11      Q.   Did the victim tell you if she had been touched

12  anywhere in reference to her back side?

13      A.   She did.

14      Q.   Where did she tell you that she had been

15  touched?

16      A.   She told me she had been touched on her bootie.

17           MR. FITZGERALD:  With that, Your Honor, no

18  further questions of this witness.

19           THE COURT:  When you said about this touching

20  she talked about, was this the day the uncle came home or

21  some other day?

22           THE WITNESS:  I did a follow-up question, and

23  she indicated it had been a different day.

24           THE COURT:  Did she give you any idea of where

25  in range of the uncle coming home day?

26           THE WITNESS:  No, she did not.

51

1           THE COURT:  Cross-examination, Mr. Hroziencik.

2           MR. FITZGERALD:  Can I approach, Judge?

3           THE COURT:  Sure.

4                       CROSS-EXAMINATION

5           BY MR. HROZIENCIK:  Q.  Good afternoon,

6    Detective Alcaraz.

7      A.    Good afternoon.

8      Q.    Detective Alcaraz, when you first began

9    speaking with Jane Doe and you asked her about crayons,

10   you asked her if she could give you a blue color crayon

11   in the cup, and she gave you the wrong color.  She

12   reached for the crayons and gave you a crayon in response

13   to your question, correct?

14     A.    She did.

15     Q.    She didn't respond to you "I don't know my

16   colors" at that point?

17     A.    No.

18     Q.    Insofar as your questioning about knowing the

19   difference between the truth and a lie, that was pretty

20   much limited to your question of -- or your example of if

21   I told you your name was Yuritza, would that be the truth

22   or a lie?

23     A.    That's correct.

24     Q.    When Jane Doe told you about what happened or

25   when you asked her about what happened, she said that she

26   was downstairs lying on the couch, lying on her stomach?

52

1       A.    Yes.

2       Q.    And that the police came in and took Jaime to

3   jail.  Do you know if she was present when the police

4   came and took Jaime to jail?

5       A.    I don't know if she was still there when the

6   patrol guys got there.

7       Q.    Actually, Mr. Franco wasn't actually taken to

8   jail that day, right?  He was taken to the hospital,

9   correct?

10      A.    That's correct.

11      Q.    Do you know where she might have gotten that

12  information, that Mr. Franco was in jail?

13      A.    I don't know.

14      Q.    You said she did not know the name for private

15  region of her body parts?

16      A.    The vagina, she did not.

17      Q.    She did not know the name, but she was able to

18  identify it on the diagram?

19      A.    Yes.

20      Q.    Did she actually indicate with a crayon or a

21  pen on the diagrams that you were showing where she was

22  touched?

23      A.    Yes.

24      Q.    Do you have those diagrams in evidence?

25      A.    They are not here today.  I did not bring them.

26      Q.    Did you preserve them?

                                                    53

1        A.    Yes, I did.

2        Q.    When you were speaking with Jane Doe, was

3   she -- I watched your interview tape.  Obviously it's in

4   Spanish, so it was limited to my understanding, but was

5   she giving you these answers pretty much in a narrative

6   form, or were you asking her sort of yes or no questions?

7   If you can recall.

8        A.    I'm not sure if I quite understand.

9        Q.    In other words, for example, when you asked

10  her, "What happened that day?" did you say, "Were you on

11  the couch?"

12            Or did you say, "What happened that day?"

13            Did she tell you, "Well, I was sitting on the

14  couch" or, "I was lying on the couch"?

15       A.    No.   I tend to ask open-ended questions.

16       Q.    So she said she was lying on her stomach, and

17  she said that Mr. Franco was on top of her when her uncle

18  Martin came in, correct?

19       A.    Yes.

20       Q.    And she said that the police came and took

21  Jaime to jail?

22       A.    That's correct.

23       Q.    With regard to these other instances that she

24  said happened, or the other instance, did she say how

25  many times besides that particular day Mr. Franco touched

26  her vagina?

54

1          A.    No, she did not.

2          Q.    With regard to your interview of Mr. Franco, or

3    Mr. Guzman, Franco Guzman, when you were speaking to him

4    in the hospital, that was the day after he was admitted

5    to the hospital?

6          A.    Yes.

7          Q.    Do you know whether he was under -- or that he

8    was on any kind of medication?

9          A.    No.  I did not know.

10         Q.    Did you speak to any of his doctors?

11         A.    No.

12         Q.    Were you able to observe any of his wounds?

13         A.    No.

14         Q.    Do you know, were you able to access any of his

15   medical records to find out the nature of the stab

16   wounds?

17         A.    No.

18              MR. HROZIENCIK:  Thank you.  I have nothing

19   further, Your Honor.

20              THE COURT:  Redirect?

21              MR. FITZGERALD:  No, Your Honor.

22              THE COURT:  Sir, it wasn't clear to me the

23   gray -- the crayon incident.  What did you do with this

24   child regarding the crayon, your understanding of it?

25              THE WITNESS:  I initially asked her to retrieve

26   certain colors from a coffee mug that was filled with

                                                            55

1  crayons.

2              THE COURT:  Okay.

3              THE WITNESS:  She failed to give me the correct

4  colors on both occasions that I asked.

5              THE COURT:  What colors did you ask for?

6              THE WITNESS:  I asked for first a blue crayon

7  and then a brown crayon.

8              THE COURT:  Did you ever hold up a crayon and

9  ask her -- a different crayon, I mean, and ask her what

10 color it was?

11             THE WITNESS:  No.

12             THE COURT:  Thank you.

13             Anything else, Mr. Fitzgerald, of this witness?

14             MR. FITZGERALD:  Just on that.

15                      REDIRECT EXAMINATION

16             BY MR. FITZGERALD:  Q.  Detective, after the

17 color issues, did you then ask her to do certain things

18 with the crayon?

19        A.   Yes, I did.

20        Q.   Was she able to successfully perform all the

21 tasks you asked of her?

22        A.   Yes.

23        Q.   Was she able to answer all of her questions

24 when you spoke with her?

25        A.   Yes.

26             MR. FITZGERALD:  No further questions.

```
 1                THE COURT:  Anything else, Mr. Hroziencik?

 2                MR. HROZIENCIK:  No, Your Honor.

 3                THE COURT:  May this witness be excused,

 4    Mr. Fitzgerald?

 5                MR. FITZGERALD:  Yes.  With the People's

 6    thanks.

 7                MR. HROZIENCIK:  Yes.

 8                THE COURT:  Thank you for coming.  You are free

 9    to go.  Good luck in your career.  Stay safe.

10                We are going to take a short recess, because I

11    suspect you are about to rest, Mr. Fitzgerald.  Is that

12    true?

13                MR. FITZGERALD:  No.

14                THE COURT:  Why not?

15                MR. FITZGERALD:  Because I'm going to deal with

16    the issue Mr. Hroziencik has raised on direct and re-call

17    Mr. Torres, Detective Torres, for that purpose.

18                THE COURT:  Oh, okay.

19                You are not going to call him -- let

20    Mr. Hroziencik call him as his witness and therefore get

21    the advantage of cross-examination.  So we'll do that

22    shortly at 25 of.

23                We'll take a short recess, and then we'll have

24    Detective Torres be up here.  Okay?  Thank you.

25                Court is in recess.

26                (Recess taken.)
```

```
 1                THE COURT:   We are back on the record.

 2                Detective, come on up here.   You are still

 3   under oath.

 4                Apparently Mr. Fitzgerald wants to ask you some

 5   more questions.

 6                Go ahead.

 7                MR. FITZGERALD:   Thanks, Your Honor.

 8                With regard to my question, the issue of

 9   competency the People have researched, and the People are

10   prepared to submit on case law as to the premise that

11   during --

12                THE COURT:   Are you making argument or asking

13   questions of the witness?

14                MR. FITZGERALD:   What I would like, Your Honor,

15   is to give Your Honor a case, so I'll wait until argument

16   for that.   I'll start with the detective.   Sorry, Judge.

17                          MANUEL TORRES,

18   re-called as a witness by the Plaintiff, having been

19   previously sworn, testified as follows:

20                        DIRECT EXAMINATION

21                BY MR. FITZGERALD:   Q.   Detective, can I ask

22   you a few questions about your contact interview with the

23   defendant in connection with this case.   You mentioned

24   that you transported the defendant to the San Mateo

25   County Jail; is that right?

26        A.   Correct, sir.
```

58

1    Q.    Prior to transport, did you advise the

2    defendant of his Miranda rights?

3        A.    Yes.

4        Q.    Is this from a card or from memory?

5        A.    From a card.

6        Q.    Did you bring that card with you here today?

7        A.    I did.

8        Q.    Can you please read the rights you read the

9    defendant.

10       A.    You have the right to remain silent.

11             Anything you say can and will be used

12             against you in a court of law.   You

13             have the right to talk to a lawyer and

14             have him present with you while you are

15             being questioned.   If you cannot afford

16             to hire a lawyer, one will be appointed

17             to represent you before any questioning

18             if you wish one.   Do you understand

19             each of these rights as I have

20             explained them to you?

21       Q.    What was the defendant's response?

22       A.    "Yeah."

23       Q.    After advising the defendant of his rights, the

24   defendant then engaged you in conversation regarding some

25   alleged inappropriate contact involving a minor?

26       A.    Correct.

1     Q.   Did you have a chance to hear the testimony by

2  the other detective here in court?

3     A.   Yes, sir.

4     Q.   Regarding the actual relationship between him

5  and this child victim, did he characterize their

6  relationship?

7     A.   He kind of characterized it as they might have

8  had a dating relationship, is the -- what I projected

9  from it.

10     Q.   Let's talk about what actually was said.

11  That's possibly argument for attorneys.  But what did the

12  defendant say about his relationship with the victim?

13     A.   Where would you like me to start?

14     Q.   Not in terms of the actual acts that he is

15  alleged to have committed, but did he describe how he

16  viewed the victim?

17     A.   Basically -- can I refer to my report?

18     Q.   Sure.  If it would help refresh your

19  recollection.  You can look at the bottom portion of your

20  Miranda interview with the defendant.

21     A.   I asked Mr. Guzman if he can tell the victim

22  anything, and Mr. Guzman explained to me that he would

23  tell her that he loves her as a friend, that he never

24  meant to hurt her in any way, and that the worst pain in

25  his life was realizing he did not fool around and screw

26  up their lives.

 1      Q.   When he was discussing this conduct with the
 2   victim, did he identify at all with the victim or make
 3   any statements about what he believed she was thinking?
 4   Does that make sense?
 5      A.   Yes.   What I was projecting from his
 6   conversation with me.
 7      Q.   What did he say to you?
 8      A.   I'm sorry.   I am confused.
 9      Q.   Okay.   Let me try and help.   When you were
10   discussing with the defendant his interactions with the
11   victim, did he describe any fears or troubles about what
12   he thought the victim would think of him?   Does that make
13   sense?
14      A.   Yes.
15      Q.   Okay.   Do you want to answer that if you can?
16   What did he describe?   What did he tell you?
17      A.   He -- I'm sorry.   I'm not exactly sure what
18   portion.
19      Q.   Just one moment, sir, and I'll show you what he
20   said.
21           THE COURT:   I thought we were using Detective
22   Torres regarding competency, Mr. Fitzgerald.
23           MR. FITZGERALD:   We were, and the People have a
24   legal position on that issue.   I do have just a couple
25   more questions on the statement.
26           THE COURT:   Let's let Mr. Hroziencik see if he

61

1  can establish that she is not.

2          MR. FITZGERALD:  All right.  The People would

3  object to any line of questioning in that regard under

4  the case of <u>People versus Robert Daily</u>, D-a-i-l-y.  It

5  specifically states in its holding a -- I'm sorry, a 1996

6  opinion that the competency of a child witness, when

7  introduced through Proposition 115, was not relevant.

8  And in that case, the child witness was deemed not

9  competent at a preliminary hearing.  Subsequently, the

10  detective testified to the Prop. 115 statements of that

11  same victim.  The defense counsel challenged the ability

12  to introduce Prop. 115 testimony on the issue of

13  competency, and the Court of Appeals noted in its holding

14  that Proposition 115 permits an officer to testify to

15  hearsay statements of a minor, and the issue of

16  competency is not relevant at a preliminary hearing.

17          So the People would have an objection to that

18  line of questioning based upon the case I have presented

19  that to counsel.  I have a copy for the court if you

20  would like to review it.

21          THE COURT:  Please give that to my bailiff.

22          Why did you bring Detective Torres back up

23  here?

24          MR. FITZGERALD:  Specifically on the issue of

25  Miranda and the issue of lewd intent, which will

26  undoubtedly be challenged during argument.

1              THE COURT:   Let's ask a germane question that

2    this witness understands and has some bearing on those

3    issues then, please.

4              MR. FITZGERALD:   Okay.

5              THE COURT:   Let me see.

6              This giving of Miranda warnings was after you

7    took the defendant to the County Jail?

8              THE WITNESS:   Before I transported him to the

9    County Jail.   It was on the ride.

10             THE COURT:   The ride to the County Jail?

11             THE WITNESS:   Correct, sir.

12             THE COURT:   This was after he had been taken to

13   the hospital?

14             THE WITNESS:   Yes, sir.

15             THE COURT:   What day was this?

16             THE WITNESS:   This was on October 10th, sir.

17             THE COURT:   Was this after you and Detective

18   Alcaraz interviewed the defendant at the hospital?

19             THE WITNESS:   Correct, sir.

20             THE COURT:   So it obviously doesn't bear on

21   that interview, Mr. Fitzgerald.  So what does it bear on?

22   Subsequent statements allegedly made by the defendant?

23             MR. FITZGERALD:   Yes.

24             THE COURT:   Let's get to them.

25             MR. FITZGERALD:   I am trying.  I think I got it

26   right here, Judge.

63

1      Q.    Detective, did the defendant make any

2    statements to the effect that the victim and he needed to

3    move on as friends?

4      A.    Yes, sir.

5      Q.    I want -- do you now know where I'm headed with

6    this, Detective?

7      A.    Yes, sir.

8      Q.    What was the defendant's response regarding his

9    relationship with the victim following this particular

10   incident?

11     A.    Basically, he stated that he thought of her as

12   a friend, but he never meant to hurt her in any way.  And

13   that basically they both needed to move on in their

14   lives.

15     Q.    Did he describe what he wanted for the victim?

16     A.    He only --

17     Q.    If it helps to refresh your recollection, it's

18   the very next sentence of your report.

19     A.    He said he wanted the victim to seek happiness

20   in life.

21     Q.    Did he characterize the victim's heart?

22     A.    Yes.  He stated that she had a good heart.

23     Q.    And did the defendant say how she would wish

24   that the defendant would be in the future?

25     A.    Yes.  If I can refer to my report?

26     Q.    Sure.  It's the very next sentence in your

                                                          64

1  report?

2      A.   He believed that the confidential victim would

3  want him also to be happy in life.

4           MR. FITZGERALD:  With that, no further

5  questions.

6           THE COURT:  Cross-examination, Mr. Hroziencik,

7  on either this or the other issue you were interested in.

8           MR. HROZIENCIK:  I don't think I will ask any

9  questions regarding the direct, but I do want to ask the

10  questions regarding competency of the hearsay.

11           THE COURT:  Go ahead.  Let's do that now.

12           MR. HROZIENCIK:  Thank you.

13                    CROSS-EXAMINATION

14           BY MR. HROZIENCIK:  Q.  Good afternoon again,

15  Detective Torres.

16      A.   Good afternoon, sir.

17      Q.   Detective Torres, did you interview the Jane

18  Doe victim in this case?

19      A.   Yes, sir.

20      Q.   At the Keller Center?

21      A.   Yes.

22      Q.   And that was on October 10th of last year?

23      A.   Correct, sir.

24      Q.   Did you attempt to establish her ability to

25  tell the difference between the truth and a lie?

26      A.   Yes, sir.

1      Q.    And when you were -- let me back up a little

2  bit.

3            Do you speak Spanish?

4      A.    Yes, sir.

5      Q.    Is that first or second language?

6      A.    It was my first language, sir.

7      Q.    So you are fluent in Spanish?

8      A.    Correct, sir.

9      Q.    The victim was speaking Spanish during your

10 interview?

11     A.    Yes, sir.

12     Q.    Now, how exactly did you attempt to see if she

13 could distinguish between the truth and a lie?

14     A.    I believe I first asked her if she knew the

15 difference between the truth and a lie, and I was unable

16 to get a definite answer from her.

17     Q.    Did you ask her it in just that way?

18     A.    Yes.

19     Q.    Did you try to ask her or give her specific

20 examples?

21     A.    I did, sir.

22     Q.    Do you recall what examples you gave her?

23     A.    I do not, sir.

24     Q.    Do you know how many different examples you

25 tried giving her?

26     A.    I don't recall exactly, sir.  Maybe two.

1    Q.    How long did you spend with her trying to see

2    if you could establish whether she could differentiate

3    between the truth and a lie?

4    A.    I do not recall the exact time, but I would

5    guess it was at least a half an hour maybe.

6    Q.    During that interview on October 10th, Jane Doe

7    also had difficulty remaining focused long enough to

8    really participate in any kind of substantive interview;

9    isn't that correct?

10   A.    Correct, sir.  When I interviewed her, she

11   continuously got up off of her chair.

12   Q.    Were you able to get her to disclose at all or

13   talk at all about anything about the incident that you

14   were talking -- were attempting to talk to her about?

15   A.    I wasn't able to, sir.

16   Q.    And this was at the Keller Center, correct?

17   A.    Correct, sir.

18   Q.    The same place that Detective Alcaraz

19   subsequently interviewed her at?

20   A.    Correct, sir.

21   Q.    And there was some support people there?

22   A.    Yes.

23   Q.    With you?

24         Who was -- who else was there with you?

25   A.    I believe Detective Liu was with me, and there

26   was a Child Protective Services agent there as well as

67

1    a rape trauma services counselor.

2        Q.   It was a relatively non-confrontational

3    setting?

4        A.   Yes, sir.

5        Q.   And yet, despite your attempts, you were unable

6    to establish whether she was able to differentiate

7    between the truth and a lie?

8        A.   Yes, sir.

9        MR. HROZIENCIK:   Thank you.   I have nothing

10   further.

11       THE COURT:   Redirect on any of the questions

12   asked by Mr. Hroziencik.

13       MR. FITZGERALD:   Yes.   Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15       BY MR. FITZGERALD:   Q.   Isn't it true that this

16   interview that you attempted was less than 24 hours away

17   from the actual incident in which the defendant was

18   arrested for?

19       A.   Correct, sir.

20       Q.   And with regards to the actual activity, the

21   house, are you aware if there was any blood or -- blood

22   evidence at the house stemming from the incident?

23       A.   I personally did not respond to the home where

24   the incident occurred, but I was aware of blood.

25       Q.   Did another officer tell you what the scene

26   looked like?

1      A.    Yes.

2      Q.    Which officer was this?

3      A.    I believe Officer Wohler.

4      Q.    What did this officer tell you about what the

5  house condition was after this incident?

6      A.    Basically, he just briefly described how the

7  subject was attempting to cut himself in the kitchen, and

8  there was blood within the kitchen floor.

9      Q.    Where is the kitchen in relation to the couch

10  and the living room that you described?

11      A.    I do not know, sir.

12      Q.    I think it was the other detective.

13          With regard to this attempt to interview, did

14  you have a lot of training and experience in dealing with

15  children witnesses at the Keller Center?

16      A.    I have had training with interviewing children;

17  however, I have done less that six interviews and have

18  yet get to be successful with getting a disclosure for a

19  minor child.

20      Q.    You are 0 for 6?

21      A.    Yes, roughly, with young children.

22          THE COURT:  Mr. Fitzgerald, in light of this

23  case that you are proffering an objection, why should I

24  hear any more questions on this subject provoked by you?

25          MR. FITZGERALD:  That's why the People

26  objected, to begin with.  As a backup, Your Honor, I am

1    attempting to establish an explanation for lack of

2    competence if defense counsel persists in arguing it.

3             THE COURT:  We have other cases going.

4             MR. FITZGERALD:  With that, Your Honor, no

5    further questions.

6             THE COURT:  Anything else, Mr. Hroziencik, on

7    the subject of this witness?

8             MR. HROZIENCIK:  No, Your Honor.

9             THE COURT:  You may step down, Detective.

10            Any other evidence you wish to present at this

11   point, Mr. Fitzgerald?

12            MR. FITZGERALD:  No, Your Honor.

13            THE COURT:  Do you rest?

14            MR. FITZGERALD:  Yes.

15            THE COURT:  Mr. Hroziencik, have you had a

16   chance to look at the Daily case?

17            MR. HROZIENCIK:  Just the holding notes and one

18   page.  I haven't had a chance to review the whole thing.

19            THE COURT:  Kind of boggles your mind, doesn't

20   it?

21            MR. HROZIENCIK:  It kind of does, and I'm not

22   sure it's completely on point.

23            THE COURT:  Well, are you prepared to argue

24   this subject?  Or do you want some time to read it?

25            MR. HROZIENCIK:  Can I have five or ten

26   minutes?

1          THE COURT:   Sure.   Do you have any objection to
2    the one-session rule being interrupted?
3          MR. HROZIENCIK:   No.
4          THE COURT:   All right.   Let's take the
5    defendant down to the holding cell, if you might, and we
6    will bring the other defendants up here that are still
7    existing.   I think that's Mr. Jones and Mr. Ortega.
8          (Other matters called.)
9          THE COURT:   Getting back to Jaime Guzman.
10          Mr. Hroziencik is here along with Mr. Guzman.
11    The People are here, and the investigating officer is
12    here.
13          I take it there is no more evidence,
14    Mr. Fitzgerald?
15          MR. FITZGERALD:   Yes, Your Honor.
16          THE COURT:   And, Mr. Hroziencik?
17          MR. HROZIENCIK:   No evidence at this time.
18          THE COURT:   All right.   So, therefore, you wish
19    to argue -- let me back up.
20          Did you have a chance to review completely the
21    Daily case, Mr. Hroziencik?
22          MR. HROZIENCIK:   Yes, I did.
23          THE COURT:   Just so we keep this in mind, it's
24    49 Cal.App.4th 543 that the People provided.
25          MR. HROZIENCIK:   Yes.
26          THE COURT:   Comments, Mr. Hroziencik?

1          MR. HROZIENCIK:  Your Honor, I'm not in

2     agreement with the Daily case.  I think that as you might

3     expect --

4          THE COURT:  Actually, I am kind of surprised at

5     it too.

6          MR. HROZIENCIK:  First of all, I somewhat take

7     issue with the broad language on page -- I guess it's

8     page -- well, it's page 9 here of the copy that

9     Mr. Fitzgerald provided to me regarding the provisions of

10    law relating to competency relating only to witnesses

11    called to testify in court.

12         Reviewing Evidence Code section 700 and 701, I

13    don't see that limitation articulated in those sections.

14    I think that's kind of a broad-ranging assertion that's

15    not borne out by the statutes and the Evidence Code.

16         They also, the Court of Appeals out of I guess

17    it's the Second District down in LA has some fallback,

18    and I don't know exactly what they base their holding on.

19    They appear to rest primarily on that assertion, but I

20    think there is some distinguishable issues; namely, that

21    they do fall back on the fact that they point out that

22    the hearsay statements made in the Daily case, there was

23    no real indication as to lack of competency when they

24    were made on October 11th as opposed to when the witness

25    was attempted to be qualified just before the preliminary

26    hearing on that case approximately a month later.

Case 3:07-cv-06294-WHA   Document 7   Filed 02/05/2008   Page 73 of 89

1     This case I think is somewhat distinguishable,

2 and I think it goes to the heart of Your Honor -- the

3 magistrate's fact-finding function wherein Detective

4 Torres attempted to interview Jane Doe most

5 contemporaneously as possible with the incident right

6 after the date, was unable to qualify her competently.

7 She is unable to tell him the difference between the

8 truth and a lie, both using those terms and using several

9 examples that he attempted to get her to articulate that

10 distinction.

11     Furthermore, he was really unable to even focus

12 or articulate anything about what had happened, which

13 also goes to her competency as a witness also under

14 Evidence Code 701.

15     Now, later, I guess it's about ten days later

16 when Detective Alcaraz goes and interviews her, he only

17 asks one question, really, with regard to her knowledge

18 of differentiating between the truth and a lie; and that

19 was the question about, "If I said your name is Yuritza,

20 is that the truth or a lie?"

21     As Detective Alcaraz said, that was really the

22 only questioning regarding her knowledge regarding that

23 subject.  He did ask her some questions about putting

24 crayons in a box and underneath a cup and outside of a

25 cup, which would certainly indicate her ability to follow

26 directions, but it's not really pertinent to her ability

1  to be a competent witness.  So I don't think those are

2  really relevant to her competency.

3  So I don't think that he sufficiently

4  established her competency with that one question.

5  The other points of concern I have with her

6  hearsay testimony to Detective Alcaraz were some of the

7  inconsistencies particularly with the known evidence that

8  she related to Detective Alcaraz; namely, that after the

9  incident on the 9th of October, Mr. Guzman was taken by

10  police to jail.  When we know that he was not even

11  arrested until after he was discharged from Stanford

12  Hospital.

13  THE COURT:  Mr. Hroziencik, a four-year-old

14  child is not going to make the subtle distinction between

15  going to the hospital and jail if a police officer and

16  other authority type personnel are going to be taking a

17  person away.  It's natural to assume they are going to

18  jail.  That doesn't really float my boat, if you know

19  what I mean.

20  Anything else?

21  MR. HROZIENCIK:  I think that some of those

22  inconsistencies are troubling to me given the lack of

23  established competency and the passage of time and the

24  lack of contemporaneousness the possibility that these

25  facts might have been filled in by other sources.

26  THE COURT:  Sure.

1          MR. HROZIENCIK:  Rather than her actually

2     expressing her actual knowledge.

3          THE COURT:  Thank you.

4          MR. HROZIENCIK:  I'll submit it on that.

5          THE COURT:  All right.

6          Anything the People want to add?

7          MR. FITZGERALD:  Just that the Daily case

8     appears to be right on point.  Prop. 115 testimony by a

9     detective of a child witness and the issue of competency

10    is not relevant at a preliminary hearing.  The People

11    believe that based upon the evidence that's presented,

12    notwithstanding the evidence established, the child was

13    competent based upon her ability to recall details that

14    were corroborated not only by the defendant's own

15    admissions but were corroborated by the Prop. 115

16    testimony of the uncle.

17         And also based on what the court heard in terms

18    of the questioning, the court can determine competency.

19    It's the defense burden to establish that the defendant

20    was not competent, and I don't believe the defense has

21    failed to do that.

22         I would note that I didn't have a full

23    opportunity to deal with the issue of competency.  Given

24    the court's indicated ruling and also the lateness of the

25    hour, I didn't get as fully into the competency issue

26    with the second witness as I would have liked, but I am

1    prepared to submit based upon the controlling authority

2    and the evidence permitted unless the court has any

3    concerns on that issue.

4            THE COURT:  First of all, don't blame me.  If

5    you think I'm incorrect, you just plow forward and deal

6    with it later, Mr. Fitzgerald.

7            But this court notes that Evidence Code 700

8    indicates that every person, regardless of age, is

9    qualified to be a witness generally.  So they are

10   presumed to be competent.  And number two,

11   disqualification of a witness, 701 would suggest that a

12   witness or person is disqualified to be a witness if she

13   is incapable of expressing herself concerning the matter

14   so as to be understood.

15           I find from the evidence that she was able to

16   do that.

17           Incapable of understanding the duty of a

18   witness to tell the truth, I find there is sufficient

19   evidence to justify that, that she was capable of

20   understanding the duty of a witness to tell the truth.

21   But even if she didn't, this case would seem to apply.

22           Except for the fact that the competency, or

23   lack of possible competency, of a witness bears on the

24   issue of probable cause whether the magistrate thinks

25   there is probable cause based upon a relating of

26   testimony, I would think that a magistrate would be not

76

1           I note, though, that the complaint seems to
2    suggest most of the charges occurred on October 7th,
3    Mr. Fitzgerald.

4           MR. FITZGERALD:  I will explain the actual
5    charges and what our theory was.

6           With regards to Counts 1 through 15, there are
7    three separate offense dates.

8           Counts 1 and 2 deal with the two admitted
9    molestations that the defendant admitted to law
10   enforcement committed on the date that he was contacted
11   by the uncle, ultimately sent to the hospital.

12          Counts 3, 4, 5, 6, 7 and 8 deal with the six
13   total times that the defendant admitted to inserting his
14   fingers into the vagina and anus of the victim on that
15   second date.

16          And the remaining counts, Counts 9 through 14,
17   deal with the six occasions in which the defendant
18   admitted to inserting his fingers into the vagina and
19   anus of the victim on or about October 1st, based upon
20   the testimony.

21          The remaining counts, Your Honor, which would
22   be Counts 16 through 28 are an alternative theory of the
23   exact same three offences, and that's 288.7 subsection B
24   which involves any penetration of a defendant who is more
25   than ten years older than a ten-year-old victim.  It's
26   eventually the same conduct or it's the same conduct but

1   an alternative theory for charging as to the remaining
2   counts.
3           THE COURT:  Anything else, Mr. Fitzgerald?
4           MR. FITZGERALD:  Submitted, Your Honor.
5           THE COURT:  Mr. Hroziencik?
6           MR. HROZIENCIK:  No, Your Honor.  Submitted.
7           THE COURT:  The court finds reasonable and
8   probable cause to believe the defendant committed the
9   offences charged.  Therefore, I'll hold him to answer.
10          Today is the 7th.  Is the 22nd or 23rd
11  available for you, Mr. Hroziencik?
12          MR. HROZIENCIK:  I am actually going to be out
13  of town that week.
14          Would it be possible to go over to the 27th?
15          THE COURT:  Sure.  Given the fact that there
16  are a couple of holidays in between, it minimizes the
17  problem.
18          As you know, the information has to be filed
19  within 15 days of today.
20          Mr. Guzman, you are ordered to appear on
21  February 27th at 8:45 for arraignment and setting of
22  proceedings.  Thank you.
23          MR. HROZIENCIK:  Thank you, Your Honor.
24          MR. FITZGERALD:  Thanks, Judge.
25          THE COURT:  I appreciate your patience.
26          (Proceedings concluded.)

                                                    79

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF SAN MATEO

3                    --o0o--

4    THE PEOPLE OF THE STATE OF     )
     CALIFORNIA,                    )
5                                   )
                  Plaintiff,        )
6                                   )
          vs.                       )    REPORTER'S CERTIFICATE
7                                   )    CASE NO. SF347601A
     JAIME FRANCO GUZMAN,           )
8                                   )
                  Defendant.        )
9    _____)

10   STATE OF CALIFORNIA )
                         )SS
11   COUNTY OF SAN MATEO )

12        I, STACY A. GASKILL, A CERTIFIED SHORTHAND

13   REPORTER AND OFFICIAL REPORTER OF THE STATE OF

14   CALIFORNIA, COUNTY OF SAN MATEO, DO HEREBY CERTIFY THAT

15   THE FOREGOING PAGES 1 THROUGH 79, COMPRISE A TRUE,

16   ACCURATE AND CORRECT COMPUTER-AIDED TRANSCRIPTION OF THE

17   PROCEEDINGS THAT I REPORTED IN DEPARTMENT 23 ON FEBRUARY

18   7, 2007, IN THE MATTER OF THE ABOVE-ENTITLED CAUSE.

19        DATED THIS 19TH DAY OF FEBRUARY, 2007.

20

21

22

23

24                    **STACY A. GASKILL**
                      **CSR 10969**
25   _____
     STACY A. GASKILL, CSR 10969
     OFFICIAL COURT REPORTER
26

CA Codes (pen:939-939.91)

939.6.    (a) Subject to subdivision (b), in the investigation of a charge, the grand jury shall receive no other evidence than what is:

(1) Given by witnesses produced and sworn before the grand jury;

(2) Furnished by writings, material objects, or other things presented to the senses; or

(3) Contained in a deposition that is admissible under subdivision 3 of Section 686.

(b) Except as provided in subdivision (c), the grand jury shall not receive any evidence except that which would be admissible over objection at the trial of a criminal action, but the fact that evidence that would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury.

(c) Notwithstanding Section 1200 of the Evidence Code, as to the evidence relating to the foundation for admissibility into evidence of documents, exhibits, records, and other items of physical evidence, the evidence to support the indictment may be based in whole or in part upon the sworn testimony of a law enforcement officer relating the statement of a declarant made out of court and offered for the truth of the matter asserted.  Any law enforcement officer testifying as to a hearsay statement pursuant to this subdivision shall have either five years of law enforcement experience or have completed a training course certified by the Commission on Peace Officer Standards and Training that includes training in the investigation and reporting of cases and testifying at preliminary hearings.

1510.   The denial of a motion made pursuant to Section 995 or 1538.5
may be reviewed prior to trial only if the motion was made by the
defendant in the trial court not later than 45 days following
defendant's arraignment on the complaint if a misdemeanor, or 60 days
following defendant's arraignment on the information or indictment
if a felony, unless within these time limits the defendant was
unaware of the issue or had no opportunity to raise the issue.

1538.5.   (a) (1) A defendant may move for the return of property or
to suppress as evidence any tangible or intangible thing obtained as
a result of a search or seizure on either of the following grounds:
     (A) The search or seizure without a warrant was unreasonable.
     (B) The search or seizure with a warrant was unreasonable because
any of the following apply:
     (i) The warrant is insufficient on its face.
     (ii) The property or evidence obtained is not that described in
the warrant.
     (iii) There was not probable cause for the issuance of the
warrant.
     (iv) The method of execution of the warrant violated federal or
state constitutional standards.
     (v) There was any other violation of federal or state
constitutional standards.
     (2) A motion pursuant to paragraph (1) shall be made in writing
and accompanied by a memorandum of points and authorities and proof
of service. The memorandum shall list the specific items of property
or evidence sought to be returned or suppressed and shall set forth
the factual basis and the legal authorities that demonstrate why the
motion should be granted.
     (b) When consistent with the procedures set forth in this section
and subject to the provisions of Sections 170 to 170.6, inclusive, of
the Code of Civil Procedure, the motion should first be heard by the
magistrate who issued the search warrant if there is a warrant.
     (c) (1) Whenever a search or seizure motion is made in the
superior court as provided in this section, the judge or magistrate
shall receive evidence on any issue of fact necessary to determine
the motion.
     (2) While a witness is under examination during a hearing pursuant
to a search or seizure motion, the judge or magistrate shall, upon
motion of either party, do any of the following:
     (A) Exclude all potential and actual witnesses who have not been
examined.
     (B) Order the witnesses not to converse with each other until they
are all examined.
     (C) Order, where feasible, that the witnesses be kept separated
from each other until they are all examined.
     (D) Hold a hearing, on the record, to determine if the person
sought to be excluded is, in fact, a person excludable under this
section.
     (3) Either party may challenge the exclusion of any person under
paragraph (2).
     (4) Paragraph (2) does not apply to the investigating officer or
the investigator for the defendant, nor does it apply to officers
having custody of persons brought before the court.
     (d) If a search or seizure motion is granted pursuant to the
proceedings authorized by this section, the property or evidence
shall not be admissible against the movant at any trial or other
hearing unless further proceedings authorized by this section,
Section 871.5, 1238, or 1466 are utilized by the people.
     (e) If a search or seizure motion is granted at a trial, the
property shall be returned upon order of the court unless it is
otherwise subject to lawful detention. If the motion is granted at a
special hearing, the property shall be returned upon order of the
court only if, after the conclusion of any further proceedings
authorized by this section, Section 1238 or 1466, the property is not
subject to lawful detention or if the time for initiating the
proceedings has expired, whichever occurs last. If the motion is
granted at a preliminary hearing, the property shall be returned upon

order of the court after 10 days unless the property is otherwise
subject to lawful detention or unless, within that time, further
proceedings authorized by this section, Section 871.5 or 1238 are
utilized; if they are utilized, the property shall be returned only
if, after the conclusion of the proceedings, the property is no
longer subject to lawful detention.

(f) (1) If the property or evidence relates to a felony offense
initiated by a complaint, the motion shall be made only upon filing
of an information, except that the defendant may make the motion at
the preliminary hearing, but the motion shall be restricted to
evidence sought to be introduced by the people at the preliminary
hearing.

(2) The motion may be made at the preliminary examination only if,
at least five court days before the date set for the preliminary
examination, the defendant has filed and personally served on the
people a written motion accompanied by a memorandum of points and
authorities as required by paragraph (2) of subdivision (a). At the
preliminary examination, the magistrate may grant the defendant a
continuance for the purpose of filing the motion and serving the
motion upon the people, at least five court days before resumption of
the examination, upon a showing that the defendant or his or her
attorney of record was not aware of the evidence or was not aware of
the grounds for suppression before the preliminary examination.

(3) Any written response by the people to the motion described in
paragraph (2) shall be filed with the court and personally served on
the defendant or his or her attorney of record at least two court
days prior to the hearing at which the motion is to be made.

(g) If the property or evidence relates to a misdemeanor
complaint, the motion shall be made before trial and heard prior to
trial at a special hearing relating to the validity of the search or
seizure. If the property or evidence relates to a misdemeanor filed
together with a felony, the procedure provided for a felony in this
section and Sections 1238 and 1539 shall be applicable.

(h) If, prior to the trial of a felony or misdemeanor, opportunity
for this motion did not exist or the defendant was not aware of the
grounds for the motion, the defendant shall have the right to make
this motion during the course of trial.

(i) If the property or evidence obtained relates to a felony
offense initiated by complaint and the defendant was held to answer
at the preliminary hearing, or if the property or evidence relates to
a felony offense initiated by indictment, the defendant shall have
the right to renew or make the motion at a special hearing relating
to the validity of the search or seizure which shall be heard prior
to trial and at least 10 court days after notice to the people,
unless the people are willing to waive a portion of this time. Any
written response by the people to the motion shall be filed with the
court and personally served on the defendant or his or her attorney
of record at least two court days prior to the hearing, unless the
defendant is willing to waive a portion of this time. If the offense
was initiated by indictment or if the offense was initiated by
complaint and no motion was made at the preliminary hearing, the
defendant shall have the right to fully litigate the validity of a
search or seizure on the basis of the evidence presented at a special
hearing. If the motion was made at the preliminary hearing, unless
otherwise agreed to by all parties, evidence presented at the special
hearing shall be limited to the transcript of the preliminary
hearing and to evidence that could not reasonably have been presented
at the preliminary hearing, except that the people may recall
witnesses who testified at the preliminary hearing. If the people
object to the presentation of evidence at the special hearing on the

grounds that the evidence could reasonably have been presented at the preliminary hearing, the defendant shall be entitled to an in camera hearing to determine that issue. The court shall base its ruling on all evidence presented at the special hearing and on the transcript of the preliminary hearing, and the findings of the magistrate shall be binding on the court as to evidence or property not affected by evidence presented at the special hearing. After the special hearing is held, any review thereafter desired by the defendant prior to trial shall be by means of an extraordinary writ of mandate or prohibition filed within 30 days after the denial of his or her motion at the special hearing.

(j) If the property or evidence relates to a felony offense initiated by complaint and the defendant's motion for the return of the property or suppression of the evidence at the preliminary hearing is granted, and if the defendant is not held to answer at the preliminary hearing, the people may file a new complaint or seek an indictment after the preliminary hearing, and the ruling at the prior hearing shall not be binding in any subsequent proceeding, except as limited by subdivision (p). In the alternative, the people may move to reinstate the complaint, or those parts of the complaint for which the defendant was not held to answer, pursuant to Section 871.5. If the property or evidence relates to a felony offense initiated by complaint and the defendant's motion for the return or suppression of the property or evidence at the preliminary hearing is granted, and if the defendant is held to answer at the preliminary hearing, the ruling at the preliminary hearing shall be binding upon the people unless, upon notice to the defendant and the court in which the preliminary hearing was held and upon the filing of an information, the people, within 15 days after the preliminary hearing, request a special hearing, in which case the validity of the search or seizure shall be relitigated de novo on the basis of the evidence presented at the special hearing, and the defendant shall be entitled, as a matter of right, to a continuance of the special hearing for a period of time up to 30 days. The people may not request relitigation of the motion at a special hearing if the defendant's motion has been granted twice. If the defendant's motion is granted at a special hearing, the people, if they have additional evidence relating to the motion and not presented at the special hearing, shall have the right to show good cause at the trial why the evidence was not presented at the special hearing and why the prior ruling at the special hearing should not be binding, or the people may seek appellate review as provided in subdivision (o), unless the court, prior to the time the review is sought, has dismissed the case pursuant to Section 1385. If the case has been dismissed pursuant to Section 1385, either on the court's own motion or the motion of the people after the special hearing, the people may file a new complaint or seek an indictment after the special hearing, and the ruling at the special hearing shall not be binding in any subsequent proceeding, except as limited by subdivision (p). If the property or evidence seized relates solely to a misdemeanor complaint, and the defendant made a motion for the return of property or the suppression of evidence in the superior court prior to trial, both the people and defendant shall have the right to appeal any decision of that court relating to that motion to the appellate division, in accordance with the California Rules of Court provisions governing appeals to the appellate division in criminal cases. If the people prosecute review by appeal or writ to decision, or any review thereof, in a felony or misdemeanor case, it shall be binding upon them.

(k) If the defendant's motion to return property or suppress

evidence is granted and the case is dismissed pursuant to Section 1385, or the people appeal in a misdemeanor case pursuant to subdivision (j), the defendant shall be released pursuant to Section 1318 if he or she is in custody and not returned to custody unless the proceedings are resumed in the trial court and he or she is lawfully ordered by the court to be returned to custody.

If the defendant's motion to return property or suppress evidence is granted and the people file a petition for writ of mandate or prohibition pursuant to subdivision (o) or a notice of intention to file a petition, the defendant shall be released pursuant to Section 1318, unless (1) he or she is charged with a capital offense in a case where the proof is evident and the presumption great, or (2) he or she is charged with a noncapital offense defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1, and the court orders that the defendant be discharged from actual custody upon bail.

(l) If the defendant's motion to return property or suppress evidence is granted, the trial of a criminal case shall be stayed to a specified date pending the termination in the appellate courts of this state of the proceedings provided for in this section, Section 871.5, 1238, or 1466 and, except upon stipulation of the parties, pending the time for the initiation of these proceedings. Upon the termination of these proceedings, the defendant shall be brought to trial as provided by Section 1382, and, subject to the provisions of Section 1382, whenever the people have sought and been denied appellate review pursuant to subdivision (o), the defendant shall be entitled to have the action dismissed if he or she is not brought to trial within 30 days of the date of the order that is the last denial of the petition. Nothing contained in this subdivision shall prohibit a court, at the same time as it rules upon the search and seizure motion, from dismissing a case pursuant to Section 1385 when the dismissal is upon the court's own motion and is based upon an order at the special hearing granting the defendant's motion to return property or suppress evidence. In a misdemeanor case, the defendant shall be entitled to a continuance of up to 30 days if he or she intends to file a motion to return property or suppress evidence and needs this time to prepare for the special hearing on the motion. In case of an appeal by the defendant in a misdemeanor case from the denial of the motion, he or she shall be entitled to bail as a matter of right, and, in the discretion of the trial or appellate court, may be released on his or her own recognizance pursuant to Section 1318. In the case of an appeal by the defendant in a misdemeanor case from the denial of the motion, the trial court may, in its discretion, order or deny a stay of further proceedings pending disposition of the appeal.

(m) The proceedings provided for in this section, and Sections 871.5, 995, 1238, and 1466 shall constitute the sole and exclusive remedies prior to conviction to test the unreasonableness of a search or seizure where the person making the motion for the return of property or the suppression of evidence is a defendant in a criminal case and the property or thing has been offered or will be offered as evidence against him or her. A defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty. Review on appeal may be obtained by the defendant provided that at some stage of the proceedings prior to conviction he or she has moved for the return of property or the suppression of the evidence.

(n) This section establishes only the procedure for suppression of evidence and return of property, and does not establish or alter any

substantive ground for suppression of evidence or return of
property.  Nothing contained in this section shall prohibit a person
from making a motion, otherwise permitted by law, to return property,
brought on the ground that the property obtained is protected by the
free speech and press provisions of the United States and California
Constitutions.  Nothing in this section shall be construed as
altering (1) the law of standing to raise the issue of an
unreasonable search or seizure; (2) the law relating to the status of
the person conducting the search or seizure; (3) the law relating to
the burden of proof regarding the search or seizure; (4) the law
relating to the reasonableness of a search or seizure regardless of
any warrant that may have been utilized; or (5) the procedure and law
relating to a motion made pursuant to Section 871.5 or 995, or the
procedures that may be initiated after the granting or denial of a
motion.
   (o) Within 30 days after a defendant's motion is granted at a
special hearing in a felony case, the people may file a petition for
writ of mandate or prohibition in the court of appeal, seeking
appellate review of the ruling regarding the search or seizure
motion. If the trial of a criminal case is set for a date that is
less than 30 days from the granting of a defendant's motion at a
special hearing in a felony case, the people, if they have not filed
a petition and wish to preserve their right to file a petition, shall
file in the superior court on or before the trial date or within 10
days after the special hearing, whichever occurs last, a notice of
intention to file a petition and shall serve a copy of the notice
upon the defendant.
   (p) If a defendant's motion to return property or suppress
evidence in a felony matter has been granted twice, the people may
not file a new complaint or seek an indictment in order to relitigate
the motion or relitigate the matter de novo at a special hearing as
otherwise provided by subdivision (j), unless the people discover
additional evidence relating to the motion that was not reasonably
discoverable at the time of the second suppression hearing.
Relitigation of the motion shall be heard by the same judge who
granted the motion at the first hearing if the judge is available.
   (q) The amendments to this section enacted in the 1997 portion of
the 1997-98 Regular Session of the Legislature shall apply to all
criminal proceedings conducted on or after January 1, 1998.

FBI AGENT
99484NB7
TO Federal
Prosecuter

RECEIVED

FEB   5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FBI aGent 99484NB7..

We've got em



SAN FRANCISCO CA 941

04 FEB 2008 PM 9 L

U.S District Court
Clerck
450 Golden Gate ave
San Fransisco, CA 9420l

94102+3861

Jaime F. Guzman
I.D # 1069238
300 Bradford st
Redwood City, CA 94303